**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

Rebecca Brooks, et al.,

              Plaintiffs,

v.

Thomas Mahoney III, et al.,

              Defendants.

CIVIL ACTION NO. 20-cv-00281

**[PROPOSED] MOTION TO DISMISS BY DEMOCRATIC PARTY OF GEORGIA**

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    BACKGROUND ................................................................................................. 2

III.   LEGAL STANDARD ......................................................................................... 6

IV.    ARGUMENT ...................................................................................................... 7

  A.   The Court lacks jurisdiction to hear this case. ............................................. 7

    1.   Plaintiffs lack standing. ........................................................................... 7

    2.   The Eleventh Amendment bars this Court from exercising jurisdiction. ..................... 11

  B.   Plaintiffs fail to state a claim on which relief can be granted. ..................... 13

    1.   Plaintiffs' claim is simply not plausible. ................................................ 13

    2.   Plaintiffs have not pleaded a cognizable claim. ..................................... 17

  C.   Plaintiffs are not entitled to the relief they seek. ........................................ 20

V.     CONCLUSION ................................................................................................ 22

# I.        INTRODUCTION

Plaintiffs' Complaint asks this Court to selectively disenfranchise over two million Georgia voters living in several of the state's most populous counties—counties that did not ultimately support Plaintiffs' preferred presidential candidate—based on entirely unsupported voter fraud conspiracy theories. Plaintiffs' implausible allegations are based exclusively on a few isolated, unsubstantiated calls to a voter hotline (the very definition of hearsay), citations to fringe news articles, disproven studies, and projected expert analysis that has not yet actually been prepared (and is itself contingent upon data that the Complaint acknowledges has yet to be finalized or obtained). Plaintiffs ask the Court to take them at their word that this speculation and imaginary expert analysis will, upon "information and belief," eventually support their extraordinary and highly implausible allegations. None of this is sufficient to invoke this Court's jurisdiction or state any recognized or plausible federal cause of action.

This case presents neither a cogent nor cognizable legal theory. To the extent Plaintiffs allege any injury, it is not sufficient to support standing. It is political theatre, pure and simple, part of a broader and deeply troubling effort presently playing out on a national stage, to attempt to use the judiciary to cast doubt on the outcome of the presidential election. Every other court confronted with these efforts has properly rejected them. This Court should do the same and dismiss Plaintiffs' Complaint.

## II.    BACKGROUND

Notwithstanding a global pandemic and a tumultuous political landscape, Georgia ran a "custard-smooth" general election on November 3.[1] Nearly five million Georgians voted in the presidential race, and state and local election officials are now hard at work finalizing the result. Each of Georgia's 159 counties have completely reported their presidential election results, and as of 5:30 p.m. on November 13, 118 of those counties have certified those results with Secretary of State Brad Raffensperger (the "Secretary"), Georgia's chief election official.[2] As of 5:30 p.m. on November 13, the currently reported county results indicate that Joe Biden received 2,472,002 and Donald Trump received 2,457,880 votes in Georgia; in other words, Trump trails Biden by 14,122 votes.[3]

The Secretary, a Republican, has on several occasions publicly discredited allegations of fraud, assuring the State's voters that the process was fair and the votes have been accurately counted; indeed, the Secretary has reported that his office is investigating every single case of alleged voter fraud brought to the office's attention, yet not a single allegation of systematic or widespread fraud has been substantiated.[4] And, on November 11, the Secretary announced that the

---

[1] Jim Galloway, *The Georgia Secretary of State Who Insists That Two Plus Two Still Equals Four*, Atlanta J. Const. (Nov. 10, 2020), https://www.ajc.com/politics/politics-blog/opinion-the-georgia-secretary-of-state-who-insists-that-two-plus-two-still-equals-four/OI6TGTORTJGNVLFSIYZQWK52YA/.

[2] Ga. Secretary of State's Office, Nov. 3, 2020 General Election, *Counties Reporting* (last visited Nov. 13, 2020), https://results.enr.clarityelections.com/GA/105369/web.264614/#/reporting.

[3] Ga. Secretary of State's Office, Nov. 3, 2020 General Election, *Results* (last visited Nov. 13, 2020), https://results.enr.clarityelections.com/GA/105369/web.264614/#/reporting.

[4] *E.g.*, Elizabeth Elkind, *Georgia Voter Fraud Won't Change Projected Biden Victory, Secretary of State Says*, CBS News (Nov. 12, 2020), https://www.cbsnews.com/news/election-biden-georgia-voter-fraud-secretary-of-state/ ("At the end of the day, we don't see widespread voter fraud, but we will investigate every case we hear."); Justin Gray, *Secretary of State Maintains No Statewide Voter Fraud Going on Amid Calls for His Resignation*, WSB-TV (Nov. 10, 2020), https://www.wsbtv.com/news/politics/secretary-state-maintains-no-statewide-voter-fraud-going-amid-calls-his-resignation/WNSMO2Q3W5FN7BGW3XLWSTDGAY/ ("We haven't found any widespread fraud.

---

state would conduct an "audit, a recount and a recanvass all at once," to review the presidential

results by manual hand recount of the presidential election.[5] That recount is now underway across

the state, and must be completed by November 20 at 5:00 p.m., the deadline set by statute for

submitting the returns of presidential electors to the Governor for certification on November 21.

O.C.G.A. § 21-2-499(b). This ensures that presidential electors are certified by December 8th—

the "Safe Harbor" deadline set by the United States Congress, before which any controversy or

contest concerning the appointment of electors must be resolved. 3 U.S.C. § 5. The presidential

electors then meet and cast their votes on December 14. 3 U.S.C. § 7.

On November 11, the same day that the Secretary ordered the recount of the presidential

election, Plaintiffs, four Georgia voters, filed their Complaint in this action—dragging the

Governor, the Secretary, and several hand-selected counties into federal court. Compl. ¶¶ 12-21.

They advance only one claim premised on an unclear "vote dilution" theory under the First and

Fourteenth Amendments and supported only by conjectural, unsubstantiated, and conclusory

allegations of fraud and voting irregularities. *Id.* ¶¶ 49-50. In support, Plaintiffs fail to plausibly

support their extraordinary claims, pointing only to a few calls to voter hotlines and news reports

or "studies" which are conjectural and discredited. *Id.* ¶¶ 33-41. Those "studies," moreover, do not

actually support Plaintiffs' extraordinary claims attacking the vote counts in the counties at issue

in this presidential election. In other words, Plaintiffs fail to plausibly allege any sort of widespread

---

We will investigate every single case that voters bring to us."); https://mms.tveyes.com/PlaybackPortal.aspx?SavedEditID=b6069f6a-b976-4b2b-aa15-6de4ea23b0f1; Stephen Fowler & Barbara Sprunt, *Georgia Will Conduct A Hand Recount Amid GOP's Baseless Fraud Claims*, Nat'l Public Radio (Nov. 11, 2020), https://www.npr.org/2020/11/11/933830340/georgia-will-conduct-a-hand-recount-amid-gops-baseless-fraud-claims.

[5] Quinn Scanlan, *Georgia's Top Election Official Announces There Will Be 'Full By-Hand Recount in Each County' for Presidential Race*, ABC News (Nov. 11, 2020), https://abcnews.go.com/Politics/georgias-top-election-official-announces-full-hand-recount/story?id=74146620.

fraud that would actually call into question the result of the presidential outcome in the counties at issue or Georgia at large—and barely even try.

There can be no dispute that Plaintiffs seek extraordinary relief. They ask that this Court affirmatively declare "that the proper remedy for this constitutional violation as applied to presidential-election results is to exclude presidential-election results from [*only* Chatham, Clayton, Cobb, DeKalb, Fulton, Gwinnett, Henry, and Richmond counties] for the Presidential Elector certification under 3 U.S.C. § 6 for this state." Compl. ¶¶ 56-60, 64. The record before the Court is patently insufficient to justify any form of injunctive (or other) relief, much less the breathtaking relief Plaintiffs seek.

To say there is no precedent or authority to support Plaintiffs' suit would be an understatement. Although such suits are largely unprecedented before this election cycle, the past week has seen a flurry of attempts by plaintiffs across the country to similarly press for the judiciary to invalidate or find illegitimate the results of the presidential election. Without exception, those cases, one after another, have been rejected as both baseless and meritless. *See, e.g.*, *Bognet v. Sec'y Commonwealth of Pa.*, No. 20-3214, ECF No. 62 (3d Cir. Nov. 13, 2020) (affirming district court's denial of a temporary restraining order and injunction on equal protection claim premised on vote dilution by purportedly illegal ballots received after election day but prior to the ballot receipt deadline ordered by the Pennsylvania Supreme Court); *Costantino v. City of Detroit*, Opinion & Order, No. 20-014780-AW (3d Jud. Cir. Ct. Mich. Nov. 13, 2020) (denying plaintiffs' motion for a preliminary injunction in case seeking an audit, a halt to certification, and a new election because "Plaintiffs' interpretation of events is incorrect and not credible"); *In re: Enforcement of Election Laws and Securing Ballots Cast or Received After 7:00 P.M. on Nov. 3, 2020*, No. SPCV2000982-J3 (Ga. Sup. Ct., Nov. 5, 2020) (denying Trump

Campaign's petition to segregate certain ballots and noting "there is no evidence the ballots referenced in the petition [were invalid]" and "there is no evidence that the Chatham County Board of Elections or the Chatham County Board of Registrars has failed to comply with the law"); *Donald J. Trump for President, Inc. v. Benson*, Opinion & Order, No. 20-000225-MZ (Mich. Ct. Cl. Nov. 6, 2020) (denying Trump Campaign's emergency motion to cease all counting and processing of absentee ballots and noting plaintiffs provided no admissible evidence supporting their claims); *Donald J. Trump for President Inc. v. Philadelphia Cty. Bd. of Elections*, No. 2:20-CV-05533-PD, ECF No. 5 (E.D. Pa. Nov. 5, 2020) (denying Trump Campaign's emergency motion to stop the Philadelphia County Board of Elections from counting ballots); *Kraus v. Cegavske*, Order at 9, No. 20-OC-00142 (Nev. Dist. Ct. Oct. 29, 2020) (finding Trump Campaign's allegation that observers were not able to observe the process or allegation that Nevada's signature matching process was unreliable to be wholly without merit, and explaining "[t]here is no evidence that any vote that should lawfully not be counted has been or will be counted" and "[t]here is no evidence that any election worker did anything outside of the law, policy, or procedures"), *aff'd*, No. 82018 (Nev. Nov. 3, 2020) ("[Appellants'] request for relief to this court is not supported by affidavit or record materials supporting many of the factual statements made therein . . . It is unclear from the motion how appellants are being prevented from observing the process."); *Stokke v. Cegavske*, No. 2:20-CV-02046, ECF No. 27 (D. Nev. Nov. 6, 2020) (denying plaintiffs' motion for a preliminary injunction and TRO to halt ballot counting in Clark County, Nevada); *Stoddard v. City Election Comm'n*, Opinion & Order at 2–3, No. 20-014604-CZ (Mich. Cir. Ct. Nov. 6, 2020) (denying Election Integrity Fund's motion for a preliminary injunction to prohibit Detroit from certifying its results, explaining that "[b]oth Republican and Democratic inspectors were

present [for the counting of absentee ballots]" and "plaintiffs do not offer any affidavits or specific eyewitness evidence to substantiate their assertions").

Undeterred, over the past few days, Plaintiffs' counsel has filed effectively the same case in at least three other battleground states. *See Bally v. Whitmer*, No. 1:20-cv-01088-JTN-PJG (W.D. Mich. filed Nov. 11, 2020); *Pirkle v. Wolf*, No. 4:20-cv-02088-MWB (M.D. Pa. filed Nov. 12, 2020); *Langenhorst v. Pecore*, No. 1:20-cv-01701-WCG (E.D. Wis. filed Nov. 12, 2020). As with this case, in each of those, Plaintiffs fail to identify any concrete, credible evidence in support of their claims. They universally rely on rumors, debunked conspiracy theories, and expert analysis that has yet to be actually conducted. These do not the grounds for a federally cognizable lawsuit make.

This case, like all the others, is facially meritless. But the Court need not even reach the merits, because Plaintiffs fail to sufficiently allege standing and their claims are barred by the Eleventh Amendment. Even if the Court does reach the merits of Plaintiffs' complaint, it fails to state a claim for relief both because the allegations are speculative and implausible, and the single claim of "vote dilution" is unsupported by law.  Plaintiffs' Complaint should be dismissed.

### III.    LEGAL STANDARD

Whether a party has Article III standing is an issue of a court's subject matter jurisdiction under Rule 12(b)(1). *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008). The party seeking to invoke federal jurisdiction "bears the burden of proving standing." *Florida Pub. Interest Research Grp. Citizen Lobby, Inc. v. E.P.A.*, 386 F.3d 1070, 1083 (11th Cir. 2004). "When addressing a motion to dismiss for lack of standing, the court evaluates standing based on the facts of the complaint. However, the court 'may not speculate concerning the existence of standing or piece together support for the plaintiff.'" *Correa v. BAC*

*Home Loans Servicing LP*, 853 F.Supp.2d 1203, 1207 (M.D. Fla. 2012) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

To survive a 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Plausibility is the key, as the 'well-pled allegations must nudge the claim 'across the line from conceivable to plausible.'" *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1333 (11th Cir. 2010) (quoting *Sinaltrainal v. Coca–Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009)). "And to nudge the claim across the line, the complaint must contain 'more than labels and conclusions . . . '" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Court need not accept as true legal conclusions or unwarranted factual inferences. *Id.*

## IV.     ARGUMENT

### A.     The Court lacks jurisdiction to hear this case.

#### 1.     Plaintiffs lack standing.

As a threshold matter, the Court should dismiss the Complaint because Plaintiffs lack Article III standing to bring this suit. To avoid dismissal on Article III grounds, a plaintiff must show (1) an injury in fact, meaning "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," (2) a causal connection between the injury and the defendant's conduct, and (3) a likelihood that the injury will be redressed by a favorable decision. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560-61).

Plaintiffs lack standing because they fail to allege any "concrete and particularized" injury-in-fact. *Lujan*, 504 U.S. at 560-561. They do not allege that their own votes were rejected on fraudulent grounds, nor do they identify any voter who was deprived of the right to vote. Instead, they advance the widely-rejected theory that their votes have been "diluted" by the counting of

*allegedly* unlawful votes and in such number as to cast the *entire* popular vote for presidential election in Georgia in doubt. But vote dilution is a viable basis for federal claims only in specific contexts—typically in equal protection challenges to state schemes crafted to structurally and significantly devalue one community's or group of people's votes over another's, thus giving rise to standing by the impacted community. *See* Opinion, *Bognet v. Sec'y Commonwealth of Pa.*, No. 20-3214 (3d Cir. Nov. 13, 2020), ECF No. 62 at 42 ("Unlike the malapportionment or racial gerrymandering cases, a vote cast by a voter in the so-called 'favored' group counts not one bit more than the same vote cast by the 'disfavored' group—no matter what set of scales one might choose to employ."); *see also, e.g.*, *Reynolds v. Sims*, 377 U.S. 533, 563-64 (1964); *Rep. Party of Penn. v. Cortés*, 218 F. Supp. 3d 396, 406-07 (E.D. Pa. 2016) ("Vote dilution is certainly a viable equal protection theory in certain contexts. Such claims can allege that a state has enacted a particular voting scheme as a purposeful device 'to minimize or cancel out the voting potential of racial or ethnic minorities.'") (citation omitted). That is, of course, not the context asserted here. Rather, Plaintiffs base their purported injury by way of "vote-dilution disenfranchisement" only on an unsupported claim that a significant number of "illegal votes" will be counted. Compl. ¶¶ 49, 53.

Plaintiffs' theory of injury has been repeatedly rejected by federal courts across the country—including by the U.S. Court of Appeals for the Third Circuit in an order issued earlier today. As each of these courts has explained, any purported vote dilution somehow caused by the counting of allegedly illegal votes would affect *all* Georgia voters, not merely Plaintiffs and *their* votes. It is therefore a generalized grievance rather than a particularized harm and cannot support standing as numerous courts have recognized across the country. *See, e.g.*, Opinion, *Bognet v. Sec'y Commonwealth of Pa*., No. 20-3214 (3d Cir. Nov. 13, 2020), ECF No. 62 at 37 ("[A] vote

cast by fraud or mailed in by the wrong person through mistake, or otherwise counted illegally, has a mathematical impact on the final tally and thus on the proportional effect of every vote, but no single voter is specifically disadvantaged. Such an alleged 'dilution' is suffered equally by all voters and is not 'particularized' for standing purposes. The courts to consider this issue are in accord." (quotations and citations omitted)); *Donald J. Trump for President, Inc. v. Cegavske*, No. 220CV1445JCMVCF, 2020 WL 5626974, at *4 (D. Nev. Sept. 18, 2020) ("Plaintiffs never describe how their member voters will be harmed by vote dilution where other voters will not. As with other '[g]enerally available grievance[s] about the government,' Plaintiffs seek relief on behalf of their member voters that 'no more directly and tangibly benefits [them] than it does the public at large.'") (quoting *Lujan*, 504 U.S. at 573–74)); *Am. Civil Rights Union v. Martinez-Rivera*, 166 F.Supp.3d 779, 789 (W.D. Tex. 2015) ("[T]he risk of vote dilution[ is] speculative and, as such, [is] more akin to a generalized grievance about the government than an injury in fact."); *Martel v. Condos*, No. 5:20-cv-131, 2020 WL 5755289, at *4 (D. Vt. Sept. 16, 2020) (same); *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-CV-966, 2020 WL 5997680, at *59-60 (W.D. Pa. Oct. 10, 2020) (finding "Plaintiffs' theory of vote dilution," was "too speculative" and not sufficiently "concrete"); *Paher v. Cegavske* ("*Paher I*"), No. 3:20-cv-00243-MMD-WGC, 2020 WL 2089813, at *5 (D. Nev. Apr. 30, 2020) (citations omitted) (finding vote dilution "due to ostensible election fraud" was not an injury in fact: "This is not a pioneering finding. Other courts have similarly found the absence of an injury-in-fact based on claimed vote dilution."); *Paher v. Cegavske* ("*Paher II*"), No. 3:20-cv-00243-MMD-WGC, 2020 WL 2748301, at *4 (D. Nev. May 27, 2020) (plaintiffs lacked standing to bring "vote dilution" claim, despite arguing that "harm is specific to them as registered, eligible voters, who actually vote"); *Wise v.*

*Circosta*, 978 F.3d 93 (4th Cir. 2020) ("The extension does not dilute some votes relative to others—rather, it has the same effect on all North Carolina voters."). This case is no different.

Plaintiffs spill much ink simply to argue that their alleged harm is not felt by all *people*, but only by all *voters* and is therefore not generalized. *See* Compl. ¶ 54. This is incorrect. The Supreme Court has held that an asserted harm is a "generalized grievance" that "does not warrant exercise of jurisdiction" when it is "shared in substantially equal measure by . . . a large class of citizens . . . ." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). In each of the cases cited *supra*, courts found that registered voters alleging vote dilution due to potential voter fraud within their respective jurisdictions were barred by Article III from bringing such claims. In short, an alleged injury that impacts all voters in a jurisdiction equally is still generalized. *See, e.g.,* Opinion, *Bognet v. Sec'y Commonwealth of Pa*., No. 20-3214 (3d Cir. Nov. 13, 2020), ECF No. 62 at 37; *see also Cegavske*, No. 220CV1445JCMVCF, 2020 WL 5626974, at *4 (D. Nev. Sept. 18, 2020) (finding plaintiffs raise only a "'[g]enerally available grievance[s] about the government,'" when they fail to "describe how their member voters will be harmed by vote dilution where other voters will not"). That is precisely the case here.

Not only do Plaintiffs fail to allege how their supposed harm is different than anyone else's, Plaintiffs' alleged harm is entirely "conjectural." *See Spokeo, Inc.*, 136 S. Ct. at 1548; *see also, e.g.*, Opinion, *Bognet v. Sec'y Commonwealth of Pa*., No. 20-3214 (3d Cir. Nov. 13, 2020), ECF No. 62 at 48-51 (concluding speculations about possibility of voter fraud ultimately causing vote dilution too conjectural to satisfy injury-in-fact requirement). Plaintiffs' factual allegations are implausible, relying on either a few isolated and unsubstantiated calls to a voter hotline or citations to news articles or studies which are not credible. (Both are, in any event, obvious hearsay and thus inadmissible). *See infra* Section IV.B.1. But even if some of these allegations were admissible

and credited, Plaintiffs fail to tailor their claim to the specific counties whose voters they wish to wholly disenfranchise.

In other words, the Complaint simply fails to marshal any allegations that widespread fraud occurred in the defendant counties to the point where *any* vote—much less *every single vote*—in those counties should be cast aside. This is fatal to their claim. *See Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) ("We caution, however, that 'standing is not dispensed in gross': A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."). Plaintiffs can hardly escape this insufficiency by promising that they "will provide" elusive forthcoming evidence that there were enough fraudulent ballots to change the outcome of the entire election in Georgia. Compl. ¶¶ 45-47. This is, by definition, conjectural and patently insufficient to establish Article III standing.

**2.    The Eleventh Amendment bars this Court from exercising jurisdiction.**

Even if the Plaintiffs did have standing, the Eleventh Amendment in any event bars this Court's exercise of judicial power to issue Plaintiffs' requested relief because a federal court cannot order state officials to conform to state law. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). At heart, Plaintiffs' complaint claims that Defendants counted fraudulent votes, and they ask the Court to stop state officials from certifying vote totals in counties whether fraud has allegedly occurred. *See* Compl. ¶¶ 65-66. Though superficially couched in the language of a federal constitutional claim, Plaintiffs ask the Court to compel election authorities to do what they believe *Georgia* law requires—namely to reject the results of an election when "illegal votes have been received . . . sufficient to change or place in doubt the result." *See* Compl. ¶ 58 (quoting O.C.G.A. § 21-2-522.). Notwithstanding the fact that they would fail to meet their own proposed state law standard, *see, e.g.*, *Middleton v. Smith*, 273 Ga. 202, 203 (2000) ("Elections cannot be overturned on the basis of mere speculation, or an appearance of

impropriety in the election procedures." (citation omitted)), the Court cannot entertain such a request for injunctive relief requiring state officials to comply with state law.

As the U.S. Supreme Court explained decades ago in *Pennhurst*, "the principles of federalism that underlie the Eleventh Amendment" prohibit a federal court from granting "relief against state officials on the basis of state law, whether prospective or retroactive." 465 U.S. at 106; *see also id.* at 117 ("[A] federal suit against state officials on the basis of state law contravenes the Eleventh Amendment when . . . the relief sought and ordered has an impact directly on the state itself."). This is true even where, as here, state law claims are cloaked in federal causes of action. *See, e.g.*, *Balsam v. Sec'y of State*, 607 F. App'x 177, 183–84 (3d Cir. 2015) (holding Eleventh Amendment bars state law claims even when "premised on violations of the federal Constitution"); *Massey v. Coon*, No. 87-3768, 1989 WL 884, at *2 (9th Cir. Jan. 3, 1989) (affirming dismissal of suit where "on its face the complaint states a claim under the due process and equal protection clauses of the Constitution, [but] these constitutional claims are entirely based on the failure of defendants to conform to state law"); *Six v. Newsom*, No. 8:20-cv-00877-JLS-DFM, 2020 WL 2896543, at *8 (C.D. Cal. May 22, 2020) (denying temporary restraining order in part because Fifth and Fourteenth Amendment claims were predicated on violations of state law); *Acosta v. Democratic City Comm.*, 288 F. Supp. 3d 597, 626 (E.D. Pa. 2018) ("Even when voters attempt to 'tie their state law claims into their federal claims,' the Eleventh Amendment bars the state law claims." (quoting *Balsam*, 607 F. App'x at 183)); *Thompson v. Alabama*, No. 2:16-CV-783-WKW, 2017 WL 3223915, at *8 (M.D. Ala. July 28, 2017) (denying injunction where plaintiffs' federal constitutional claims rested on premise that state officials were violating state law). The lack of federal character in Plaintiffs' claim is further revealed by the fact that Plaintiffs' theory of vote dilution cannot give rise to a federal cause of action under the Equal Protection

Clause. *See, e.g.*, *Boockvar*, 2020 WL 5997680, at \*43 (W.D. Pa. Oct. 10, 2020) (holding vote dilution "is not an equal-protection issue"); *see also infra* Section IV.C.2.

As state officials, the Governor and Secretary of State are indisputably shielded by the Eleventh Amendment, as are—in this case—the various County Board members. Although counties are not ordinarily considered arms of the state for Eleventh Amendment purposes, the remedies Plaintiffs seek can *only* be enforced by state officials. *See* O.C.G.A. § 21-2-499(b) (explaining Secretary shall "tabulate, compute, and canvass the votes cast for each slate of presidential electors and shall immediately lay them before the Governor"); *id.* (explaining the Governor "shall certify the slates of presidential electors"); *see also Porter v. Gore*, 354 F. Supp. 3d 1162, 1180 (S.D. Cal. 2018) (finding *Pennhurst* extends to claims against local officials where effect would be to invalidate state law). The Eleventh Amendment bar thus extends to each Defendant in this case.

**B.     Plaintiffs fail to state a claim on which relief can be granted.**

Even if this Court had jurisdiction to consider Plaintiffs' claim, which it does not, their Complaint should in any event be dismissed pursuant to Rule 12(b)(6). Plaintiffs fail to create a plausible inference of widespread fraud and malfeasance, and their vote dilution claim fails as a matter of law.

**1.     Plaintiffs' claim is simply not plausible.**

Plaintiffs who seek the relief of a federal court must allege "enough facts to state a claim to relief that is plausible on its face," and Plaintiffs here fail to do so. *Twombly*, 550 U.S. at 570. While "the pleading standard that Rule 8 announces does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The shortcomings in Plaintiffs' complaint become even more apparent when considered through the lens of Rule 9(b), which applies to allegations

of fraud. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9(b)'s heightened pleading standard applies to claims that "sound in fraud," as these do. *Wilding v. DNC Servs. Corp*., 941 F.3d 1116, 1127 (11th Cir. 2019), *cert. denied*, 140 S. Ct. 2828 (2020); *see Crawford's Auto Ctr., Inc. v. State Farm Mut. Auto. Ins. Co*., 945 F.3d 1150, 1161 (11th Cir. 2019).

Examining the few factual allegations in the Complaint, it is clear Plaintiffs fail to meet the standards of Rule 8, much less Rule 9(b). Plaintiffs nowhere offer sufficient or plausible evidence that any illegal voting occurred, much less the type of widespread illegal voting that would be needed to essentially nullify the entire presidential election in Georgia by casting out the votes of over two million people in eight counties. The *only* specific allegations regarding any issues with voting come from a few calls to a voter hotline and include occasional, but not uncommon problems like a voter accidentally not receiving a requested mail ballot. *See* Compl. ¶¶ 35-38. But there are no allegations establishing where these callers lived, whether they were eligible voters, or how their issues were resolved. *See id*. Indeed, any or all of them could have ultimately voted.

The other allegations offered by Plaintiffs amount to nothing more than mere speculation, often baselessly inferring fraud from circumstances that cannot support such inferences. For example:

- Plaintiffs point to the statewide hand count of ballots, but do not explain how conducting "an audit, a recount and a recanvass" raises an inference of fraud.[6] Compl. ¶ 42.

---

[6] Quinn Scanlan, *Georgia's top election official announces there will be 'full by-hand recount in each county' for presidential race*, ABC News (Nov. 11, 2020), https://abcnews.go.com/Politics/georgias-top-election-official-announces-full-hand-recount/story?id=74146620 (quoting the Georgia Secretary of State).

- Plaintiffs cite a Judicial Watch study purporting to show outdated voter registration records and their broader allegations of voter fraud. *Id.* ¶ 40. But they fail to explain why this study plausibly supports their claim of widespread fraud in this election and in the counties at issue in this election; indeed, the population estimates proffered by Plaintiffs rely on data from the American Community Survey, a five-year estimate of population that lags behind actual population estimates in growing counties, artificially deflating them.

- Plaintiffs allege that voting machines crashed in two counties and claim that a similar "glitch" cause a miscalculation in a *different* state. *Id.* ¶ 34. They notably do *not* allege that any miscalculation occurred in these two counties in Georgia, neither of which is among the eight counties where they claim voter fraud requires disenfranchising all voters, nor that this crash was not resolved, what technology was actually affected, or that this issue impacted the results of the election at all, much less to the magnitude claimed here. *Id.*

- Plaintiffs allege hearsay that GOP observers were told by unidentified persons that one tabulation center was closing earlier than it actually did, but they do not claim that any or all observers actually left or that any fraud occurred after the announced closing time. *Id.* ¶ 39.

- Plaintiffs rely on a "JustFactsDaily.com" study of noncitizen voting for an entirely implausible "estimate" of non-citizen voter fraud. *Id.* ¶ 41. There are numerous problems with the underlying data, not the least of which is that the survey from which the estimate is extrapolated has a sample size so small that it identified merely 38 possible non-citizen voters nationwide, only *five* of whom could be verified as having

voted. At least one federal court has found the study upon which these claims are based to have errors that would not support the conclusion that noncitizens registered or attempted to register. *See Fish v. Kobach*, 309 F.Supp.3d. 1048, 1087-1088 (D. Kan. 2018), *aff'd sub. nom. Fish v. Schwab*, 957 F.3d 1105 (10th Cir. 2020). But regardless, even the article itself cannot support Plaintiffs' claims that unlawful voting happened in numbers so large in the counties in Georgia in question to justify invalidating all voters' ballots cast in those counties.

- Plaintiffs rely on an article by a "Senior Advisor for Strategy at the Trump 2020 campaign" for their implausible claim of a statistically unlikely rate of Biden-only ballots. Compl. ¶ 43. *By its own description*, the article is "admittedly, circumstantial rather than conclusive." Pls.' Ex. 5.

Implicitly recognizing the deficiencies in their own pleading, Plaintiffs largely rely on a promise to the Court that they *will* come forth with such evidence and have followed their complaint not with a motion for preliminary injunction, but with a motion for expedited, invasive discovery with an expedited trial. They claim that this discovery will lead to unidentified expert analysis that they project will prove their claims. In other words, Plaintiffs' complaint is nothing more than a fishing expedition for evidence they simply and admittedly do not have. *See Gibbons v. McBride*, 124 F. Supp. 3d 1342, 1358 (S.D. Ga. 2015) (dismissing claims under 12(b)(6) because "the Court will not enable a fishing expedition"); *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006) (quoting *United States v. Lab. Corp. of Am.*, 2001 WL 1867721, at *1 (N.D.Ga. May 16, 2001)) ("The particularity requirement of Rule 9 is a nullity if Plaintiff gets a ticket to the discovery process without identifying a single claim."). This is patently insufficient.

In sum, Plaintiffs' purported claim to extraordinary relief is based on unsupported allusions to a massive, covert, and heretofore undetected effort to undertake fraud, disenfranchise Republicans, and steal a presidential election (but no others), all under the watchful eyes of the entire state election apparatus that includes a Republican Secretary of State and countless election workers and poll watchers. All Plaintiffs currently present to support this narrative are flawed mathematical estimates and isolated allegations—largely hearsay—of unintentional mishaps, apparent suspicious activities, and alleged misconduct, couched in vague terms without any specific details of whether or how they relate to purported substantial fraud.

In the absence of fact, it is simply not plausible that widespread fraud, the existence of which forms the sole basis for of Plaintiffs' incognizable cause of action and astonishing prayer for relief, actually occurred. The U.S. Supreme Court has instructed that "[d]etermining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (2009). It challenges both experience and common sense to accept Plaintiffs' entirely unsupported overarching theory of widespread fraud, and under applicable pleading standards, this Court need not credit their unwarranted factual inferences.

**2.      Plaintiffs have not pleaded a cognizable claim.**

In addition, Plaintiffs have not stated a cognizable claim, much less a viable one. As an initial matter, it is unclear exactly what type of claim Plaintiffs assert. The basis of the Complaint's single Count is that "[i]f Defendants certify presidential-election results from counties where sufficient illegal ballots were included in the results to change or place in doubt the November 3 presidential-election result, Voters [sic] valid, legal votes will be unconstitutionally diluted by illegal votes" in violation of the First and Fourteenth Amendments. Compl. ¶ 54. Then, citing to *state law standards*, Plaintiffs assert that this *federal court* should determine "whether the election

results in certain counties [but not others] should be excluded for purposes of certifying Presidential Electors." *Id.* ¶¶ 58-60. But adjudicating such issues (even if there was evidence to support one, which there is not) is not a proper task for a federal court. *See supra* Section IV.A.2.

Even if the Court were to assume that Plaintiffs seek to assert an equal protection claim premised on a vote-dilution theory, they have failed to plead it. As explained *supra*, vote dilution is a viable basis for a federal equal protection claim only in certain contexts, such as when laws are crafted that structurally devalue one community's votes over another's. *See, e.g.*, *Larios v. Cox*, 300 F. Supp. 2d 1320, 1343 (N.D. Ga. 2004), *aff'd*, 542 U.S. 947 (2004) ("[A]n individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State.") (quoting *Reynolds*, 377 U.S. at 568). In such cases, which are grounded in the Equal Protection Clause, plaintiffs allege that their votes are devalued as compared to similarly situated voters. Plaintiffs have simply not pleaded such a claim. That is, Plaintiffs have not asserted that their votes have been undervalued compared to the votes of others in the state; instead, they seek to aggrandize their own by tossing millions of valid votes.

In other words, Plaintiffs' theory relies upon the premise that if a small number of unlawful ballots evade detection in some jurisdictions, then the ballots of *all* voters in *other* jurisdictions are "unconstitutionally diluted." Compl. ¶ 55 (if "illegal voting has occurred in connection with the presidential-election results, [then Plaintiffs'] votes have been unconstitutionally diluted"). But, of course, they cannot identify a single precedent adopting this theory. Rather, courts across the country have recently and emphatically *rejected* similar theories as a basis for plaintiffs to pursue election law challenges—including in cases brought by the Trump Campaign itself. *E.g.*, *Boockvar*, 2020 WL 5997680, at *45 (W.D. Pa. Oct. 10, 2020) ("[I]f Plaintiffs are right, any

unlawful votes will dilute all other lawful votes in the same way. While certainly voter fraud and illegal voting are bad, as a matter of equal protection, there is no unequal treatment here, and thus no burden on Plaintiffs' rights under the Equal Protection Clause."). The conclusion of these courts is both correct and unsurprising: claims of vote dilution based on fears of purported fraud applies to all voters equally, making it an ill-fit for an equal protection challenge.[7]

Ultimately, "[t]he Constitution is not an election fraud statute." *Minn. Voters All. v. Ritchie*, 720 F.3d 1029, 1031 (8th Cir. 2013) (quoting *Bodine v. Elkhart Cty. Election Bd.*, 788 F.2d 1270, 1271 (7th Cir. 1986)), and it "d[oes] not authorize federal courts to be state election monitors." *Gamza v. Aguirre*, 619 F.2d 449, 454 (5th Cir. 1980). Even "a deliberate violation of state election laws by state election officials does not transgress against the Constitution." *Shipley v. Chi. Bd. of Election Comm'rs*, 947 F.3d 1056, 1062 (7th Cir. 2020). There is simply no authority for transmogrifying the vote dilution line of cases that Plaintiffs cite into a requirement that the federal judiciary micromanage election procedures and disenfranchise lawful voters, let alone based on unsupported and allegations of fraud. To the contrary, courts have routinely—and appropriately— rejected such efforts. *Boockvar*, 2020 WL 5997680, at *67–68 (rejecting equal protection challenge to poll-watcher restrictions grounded in vote-dilution theory because restrictions did not burden fundamental right, including right to vote, or discriminate based on suspect classification); *Cook Cty. Republican Party v. Pritzker*, No. 20-cv-4676, 2020 WL 5573059, at *4 (N.D. Ill. Sept. 17, 2020) (denying motion to enjoin law expanding deadline to cure votes because plaintiffs did not show how voter fraud would dilute their votes); *Cortés*, 218 F. Supp. 3d at 406–07 (rejecting

---

[7] To the extent Plaintiffs rely on *Bush v. Gore*, *see* Compl. ¶ 60, it does not save their claim. In *Bush*, the U.S. Supreme Court considered "whether the use of standardless manual recounts" by some, but not all, Florida counties in the aftermath of the 2000 presidential election violated the Equal Protection Clause. 531 U.S. 98, 103 (2000). The *Bush* Court emphasized that an equal protection claim lies only where there is both arbitrary *and* disparate treatment by the state. *Id.,* at 105. Plaintiffs have not made such an allegation; nor could they.

requested expansion of poll-watcher eligibility based on premise that voter fraud would dilute weight of plaintiffs' votes); *Wise v. Circosta*, 978 F.3d 93 (4th Cir. 2020) ("The extension does not dilute some votes relative to others — rather, it has the same effect on all North Carolina voters."); *see also Minn. Voters All.*, 720 F.3d at 1031–32 (affirming Rule 12(b)(6) dismissal of vote dilution claim); *Partido Nuevo Progresista v. Perez*, 639 F.2d 825, 827–28 (1st Cir. 1980) (per curiam) (rejecting challenge to purportedly invalid ballots because plaintiffs' claimed that votes were 'diluted' by the votes of others, not that they themselves were prevented from voting).

In short, because Plaintiffs have failed to articulate any cognizable claim, their complaint should be dismissed.

## C.     Plaintiffs are not entitled to the relief they seek.

Plaintiffs ask for relief that is disproportionate, implausible, and unconstitutional. Plaintiffs' requested relief is not tailored to the alleged violations in the complaint because instead of *remedying* a constitutional violation, their requested relief would in fact *violate* millions of Georgians' constitutional rights. *See* Opinion, *Bognet v. Sec'y Commonwealth of Pa.*, No. 20-3214 (3d Cir. Nov. 13, 2020), ECF No. 62 at 8 (affirming denial of vote dilution claim "with commitment to a proposition indisputable in our democratic process: that the lawfully cast vote of every citizen must count"); *Gallagher v. N.Y. State Bd. of Elections*, No. 20-5504, 2020 WL 4496849, at *16 (S.D.N.Y. Aug. 3, 2020); *Stein v. Cortez*¸ 223 F.Supp.3d 423, 442 (E.D. Pa 2016) (granting relief that "could well ensure that no Pennsylvania vote counts . . . would be both outrageous and completely unnecessary"); *Marks v. Stinson*, 19 F.3d 873, 888 (3d Cir. 1994) (refusing to grant relief that would determine election based on non-absentee ballots—despite proven fraud in absentee ballots—because "[o]ur primary concern here is . . . to promote the public's interest in having legislative power exercised only by those to whom it has been legally

delegated" and "[t]his interest is not served by arbitrarily ignoring the absentee vote, a substantial but undetermined portion of which was . . . legally cast").

And in any event, the State is already undergoing a verification process through a full hand recount to confirm the validity and accuracy of this election, rendering Plaintiffs' requested relief moot. Indeed, elections officials across Georgia are currently conducting "an audit, a recount and a recanvass all at once."[8] While casting and counting votes is *already* subject to multiple layers of scrutiny and protection (*see, e.g.*, O.C.G.A. § 21-2-386(a) (signature verification); Ga. Comp. R. & Regs. 183-1-12-.12 (tabulating results)), this current and ongoing hand recount, likewise subject to scrutiny and observation, will essentially audit the results *without* disenfranchising eligible Georgia voters.[9] Accordingly, because Plaintiffs' gambit to circumvent the will of Georgia's electorate "has no essential or important relationship to the claim for relief," their complaint should be dismissed or, in the alternative, the Court should strike the improper prayer for relief. *See, e.g., Rees v. PNC Bank, N.A.*, 308 F.R.D. 266, 271 (N.D. Cal. 2015) (quoting *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993)) (explaining that courts may strike portions of complaints when they bear no "essential or important" relationship to the claims); *see also Bingham v. HCA, Inc.*, 783 F. App'x 868, 876 (11th Cir. 2019) ("As the district court noted, it is important to discourage plaintiffs from being able to 'learn the complaint's bare essentials through discovery' which could 'needlessly harm a defendants' [sic] goodwill and reputation by bringing a suit that is, at best, missing some of its core underpinnings, and, at worst, are baseless allegations used to extract settlements.'").

---

[8] Quinn Scanlan, *Georgia's Top Election Official Onnounces there will be 'full by-hand recount in each county' for presidential race*, ABC News (Nov. 11, 2020), https://abcnews.go.com/Politics/georgias-top-election-official-announces-full-hand-recount/story?id=74146620 (quoting the Georgia Secretary of State).

[9] *See* Chris Harvey, Ga. Sec'y of State's Office, Elections Division Director, *Audit Instructions* (Nov. 12, 2020).

## V.     CONCLUSION

Just four years ago, the Trump Campaign stated the following in objecting a recount request

by Dr. Jill Stein:

> By "contesting" the clear choice of millions of voters in [the state], [Plaintiffs]
> aim[] to sow doubts regarding the legitimacy of the presidential election while
> denying millions of people in . . . a seat at the Electoral College table. And in
> bringing mayhem to the otherwise orderly, time-honored Electoral College process,
> [Plaintiffs are] meddling with confirmation of the election's outcome when
> Congress meets in January [2020]. Ultimately, [Plaintiffs] cannot change the
> outcome of the presidential election. But [they] apparently ha[ve] no qualms over
> creating constitutional chaos in [their] effort to do so. . . . The law does not require
> the State to support this ruse, and it should not do so.

Donald J. Trump & Donald J. Trump for President, Inc.'s Objections to Dr. Jill Stein's Recount

Pet., *In re Pet. for Recount for Office of President of U.S. of Am.* (Mich. Bd. of State Canvassers

Dec. 1, 2016). Nor should this Court.

For the foregoing reasons, Proposed Defendant-Intervenor respectfully requests that the

Court dismiss Plaintiffs' complaint.

Dated: November 13, 2020.                    Respectfully submitted,

/s/ TODD M. BAIAD
Todd M. Baiad
Georgia Bar No:  031605
Lucas D. Bradley
Georgia Bar No:  672136
BOUHAN FALLIGANT LLP
One West Park Avenue (31401)
P.O. Box 2139
Savannah, GA 31402-2139
Telephone: (912) 232-7000
Facsimile: (912) 233-0811
tmbaiad@bouhan.com
ldbradley@bouhan.com

Halsey G. Knapp, Jr.
Georgia Bar No. 425320
Joyce Gist Lewis
Georgia Bar No. 296261

KREVOLIN & HORST, LLC
One Atlantic Center
1201 West Peachtree Street, NW
Suite 3250 | Atlanta, GA 30309
Tel: 404-888-9700
hknapp@khlawfirm.com
jlewis@khlawfirm.com

Marc E. Elias*
Amanda R. Callais*
Alexi M. Velez*
Emily R. Brailey*
PERKINS COIE LLP
700 Thirteenth Street NW, Suite 800
Washington, DC 20005
Telephone: (202) 654-6200
melias@perkinscoie.com
acallais@perkinscoie.com
avelez@perkinscoie.com
ebrailey@perkinscoie.com

Kevin J. Hamilton*
Amanda J. Beane*
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
Telephone: (206) 359-8000
khamilton@perkinscoie.com
abeane@perkinscoie.com

Gillian C. Kuhlmann*
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Los Angeles, California 90067
Telephone: (310) 788-3900
gkuhlmann@perkinscoie.com

Matthew J. Mertens
Georgia Bar No: 870320
PERKINS COIE LLP
1120 NW Couch Street, 10th Floor
Portland, Oregon 97209
Telephone: (503) 727-2000

*Counsel for Proposed Intervenor-Defendant*
*\*Pro Hac Vice Application Pending*

**CERTIFICATE OF SERVICE**

I hereby certify that on the November 13, 2020, I electronically filed the within document with the Clerk of the Court using the CM/ECF system which will automatically send e-mail notification of such filing to the attorneys of record.

s/ TODD M. BAIAD
Todd M. Baiad
Georgia Bar No:  031605
One West Park Avenue (31401)
P.O. Box 2139
Savannah, GA 31402-2139
Telephone: (912) 232-7000
Facsimile: (912) 233-0811
tmbaiad@bouhan.com
